Estate of Elizabeth A. Wilson, S. A. Regenold, Administrator v. Commissioner.
Estate of Elizabeth A. Wilson v. Commissioner
Docket No. 12211.
United States Tax Court
1951 Tax Ct. Memo LEXIS 151; 10 T.C.M. (CCH) 750; T.C.M. (RIA) 51247; August 7, 1951
*151 1. Petitioner's decedent at the time of her death was the owner of 2,666 2/3 shares of beneficial interest out of a total of 10,000 issued shares of a business trust. These shares had a fair market value at the time of decedent's death of $395 per share and should be included at such value in decedent's estate for estate tax purposes. 2. Respondent did not err in including in decedent's estate certain fraternal insurance on her life under a policy issued to her and payable to her children upon her death and held by her at her death. Geo. E. H. Goodner, Esq., Munsey Bldg., Washington 4, D.C., and Scott P. Crampton, Esq., for the petitioner. E. G. Sievers, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined a deficiency in estate tax in the sum of $496,311.76. The estate tax return was filed with the collector of internal revenue for the district of Arkansas. Only two issues are presented: (a) the fair market value of 2,666 2/3 certificates of beneficial interest in Lee Wilson & Co., a business trust, owned by the decedent, Elizabeth A. Wilson, on the date of her death, June 15, 1943, and included *152 in her estate for estate tax purposes; and (b) was the amount of $3,000, representing fraternal insurance payable to decedent's children upon her death, includible in her gross estate? An issue raised by the pleadings as to the fair value of 79 shares of stock in the Bank of Wilson owned by the decedent on the date of her death has been waived by the petitioner, and the fourth issue, involving credit against estate tax by reason of inheritance taxes payable to the State of Arkansas, will be determined under Rule 50. Findings of Fact The decedent, Elizabeth A. Wilson, died testate on June 15, 1943, a resident of Wilson, Arkansas. S. A. Regenold is the duly appointed, qualified and acting executor of the decedent's estate. On October 5, 1943, the petitioner filed an estate tax return with the collector of internal revenue for the district of Arkansas, electing thereon to use the date of death as the date of valuation of the estate. This return reported a total estate tax of $272,971.26, on which payments have been made by petitioner, under the installment provisions of the code, on the dates and in the amounts as follows: March 3, 1946
$27,297.12
August 2, 1947
27,297.12
October 1, 1948
27,297.12
August 15, 1949
27,297.12
*153 At or before the time of making each of the above payments, petitioner secured an extension of time for the payment of the balance as allowed by law. Included in the assets of decedent's estate for estate tax purposes were 2,666 2/3 shares or certificates of beneficial interest in Lee Wilson & Co., a business trust, which shares the decedent owned at the time of her death. In the estate tax return these certificates of beneficial interest, hereinafter referred to as shares, were reported at a value of $353.92 per share, or a total of $943,786.66. This value was computed by the executor as the value determined by respondent in 1933 for such shares which had been included in the estate of the decedent's husband who died in that year, plus accumulated earnings of the company since that date, less the distributions made to the shareholders from January 31, 1933 to January 31, 1943. It is now conceded by the petitioner that the figure of fair market value shown in the return should have been $392.17 a share. Following the filing of the estate tax return, it was examined by representatives of respondent and thereafter a conference was held at Little Rock, Arkansas, between the representatives *154 of the petitioner and a Mr. Reynolds who represented the respondent in estate tax matters in the Oklahoma City district. Following this conference Reynolds advised that his determination of fair market value of the shares of Lee Wilson & Co. was $392.17 per share, which valuation increased the estate tax by the sum of $37,294.34. Petitioner agreed to this increase and this amount was assessed and paid. Following the aforesaid determination, assessment and payment of the additional estate tax, respondent, in the same year, asserted a further additional estate tax against petitioner, and another conference was held in Oklahoma City, as a result of which petitioner agreed to further additional assessment of $17,386.64, which amount was thereupon assessed against petitioner and paid. On July 16, 1946, subsequent to the payment of the additional assessments of estate tax just detailed, the respondent asserted a deficiency of $496,311.76, which is the amount involved in this proceeding. The business trust known as Lee Wilson & Co. was organized in 1917. The trust instrument was revised to some extent in 1919, and the trust was continued in 1937 by a third trust instrument for a period *155 of 21 years, or until 1958. It is a trust taxable as a corporation and has at all times had issued and outstanding 10,000 shares of beneficial interest. These shares were owned by the decedent, her husband, R. E. Lee Wilson, and their three children. On the death of decedent's husband in 1933, she acquired, as his widow, one third of the shares owned by him at his death, increasing her total to 2,666 2/3 shares. There have been no sales of shares of Lee Wilson & Co. at any time, although shares in small number have been transferred by gift to certain of the grandchildren of the decedent. At no time pertinent hereto has there been a market for the shares of Lee Wilson & Co., nor are they acceptable by banks as collateral security for loans. At the time of decedent's death, on June 15, 1943, the shares were held in the following proportions: Number of
Certificate Holder
Shares
Elizabeth A. Wilson
2,666 2/3
R. E. Lee Wilson, Jr.
1,884 4/9
Mrs. Marie Howell
1,444 4/9
Mrs. Victoria Wesson
2,144 4/9
Lt. J. W. Nelson
1,000
Lee Wilson
300
R. E. Lee Wilson III
320
F. O. Wilson
170
Mrs. Roy Wilson, Jr.
20
R. E. Wilson IV
20
MRS. @F. O. Wilson
10
Mrs. R. E. Wilson III
10
M. E. Wilson
10
*156 The business of Lee Wilson & Co. was organized many years ago as a timber and sawmill operation. Large acreages of timber were acquired and, as this timber was removed, the land was cleared and put in cultivation, mainly cotton. For a period prior to the execution of the trust here in question the business operated as a corporation. Under the terms of the trust instrument the affairs and operations of the trust are carried on by the trustee who has the absolute power, under the trust instrument, to decide within his own discretion what is to be done in the carrying on of operations for the production of revenue and as to what amount, if any, is to be distributed from such earnings to the holders of shares in the trust. The owners of shares have no voice in the management. It is provided in the trust deed that they shall meet annually to receive the report of the trustee, they being permitted to have an audit made, at the expense of the trust, of his transactions if they so desire. Under the terms of the trust the owners of three fourths of the shares thereof may act to terminate the trust. The first trustee of Lee Wilson & Co. was the decedent's husband, and upon his death in *157 1933 the owners of the shares, under the provisions of the trust instrument, appointed J. H. Crain as managing trustee and R. E. Lee Wilson, Jr. as co-trustee. As managing trustee, Crain has the power to act as trustee without being joined by the co-trustee, and the latter has no right to act independently. Crain, since his appointment as trustee, has had complete control and management. He has exercised, under authority of the trust instrument, his powers to determine all actions to be taken by the business and, in his conduct of its affairs, to mortgage or sell property of the business, borrow funds for operations or for acquisition of additional properties and to engage in business ventures for the trust which in his discretion are deemed to be for its interest. Upon the termination of the trust in 1958, it is provided in the trust instrument that it may be continued upon the vote of two thirds of the shares then outstanding. Certain pertinent provisions of the trust instrument as in effect upon the death of the decedent read an follows: "KNOW ALL MEN BY THESE PRESENTS, That we, R. E. Lee Wilson, Jr., and J. H. Crain, as the duly elected, appointed, qualified and acting trustees *158 * * * do hereby declare that we hold all of the property belonging to 'Lee Wilson & Company' for the following uses and purposes, and upon the following trusts, to-wit: "1. The legal title to said property is vested in us absolutely, with full and absolute power to manage, control, sell, assign, pledge, hypothecate, mortgage, convey and otherwise dispose of the same, and to execute any and all instruments necessary for that purpose, including assignments, bills of sale, mortgages, deeds of trust, bonds for title, deeds and conveyances, as fully and complete as if we were the sole and absolute owners of the legal and equitable title thereto. * * *
"3. We have plenary power and absolute authority to manage, control, sell, assign, pledge, mortgage, convey and otherwise dispose of said property, or any part thereof; to buy, sell, manage, deal in, rent, lease and otherwise handle real estate, and any interest therein; to acquire, hold, manage, control and operate saw mills and other plants for the manufacture of forest materials into various finished products; to buy, sell and deal in lumber and all other things manufactured from forest products; to buy, hold, sell and deal in *159 bonds, stocks and securities of every kind and character, and to exercise the voting power of all corporate stocks belonging to the trust estate; to engage in mercantile, manufacturing, trading, planting, farming, agricultural and other businesses, to borrow money, and to execute evidences of indebtedness therefor; and to secure the same by mortgage, or deed of trust on, or a pledge of, the trust property, or any part thereof; to acquire, operate and sell and otherwise deal in oil and mineral lands and leases; to loan money at interest, and take securities therefor; to form partnerships with third persons for the benefit of the trust estate, to manage and control the interests of the trust in partnerships already existing through such partnerships, and to conduct any part of the trust business through partnerships; and to manage, direct and control the trust estate, and any business or venture conducted for it, as fully and completely as if it were our personal and individual affair. * * *
"5. The beneficiaries of the trust have no right, title, or interest, either in law or in equity, in or to the corpus of the trust property or any part thereof, nor have they any right, either *160 at law or in equity, to possess, manage, control or dispose of the same, or to direct the possession, management, control or disposition thereof; and their rights are and shall be limited exclusively to an interest in the dividends arising from the possession, use, management, control, disposition, assignment, sale and conveyance of said property, and from the business or other ventures which the trustees may conduct or make with or for said property or the trust estate, as such dividends may be declared from time to time by the trustees as provided herein. * * *
"8. The ownership of the certificates of interest shall not entitle the holders thereof to call for a partition or division of the trust estate. And it is agreed and hereby expressly declared that a trust, not a partnership, is created by this instrument, and that the holders of the certificates of interest are cestuis que trustent, and occupy no other relation to the trustees than that of cestuis que trustent, with only such rights as are conferred on them by the terms of this declaration. "9. The death of any holder of a certificate of interest shall not operate to terminate the trust, nor shall it entitle the legal *161 representatives of the deceased holder to an accounting, or to take any action in the courts or elsewhere against the trustees; but the executors, administrators, or assigns of any deceased holder of a certificate of interest shall succeed to the rights of such decedent to the certificate, and to the interest which it represents under the terms of this trust, upon the surrender of such certificates and the issue of a new one in its stead." * * *
From its beginning, as a timber and sawmill operation, Lee Wilson & Co. has grown into a farming and industrial enterprise. At the time of decedent's death in 1943, Lee Wilson & Co. owned and operated approximately 46,000 acres of land with improvements thereon. This land was not one unit but consisted of large holdings at various points. The headquarters of the company are at Wilson, Arkansas. This town is wholly owned and operated by the company. It has been built, as have several other towns on its properties, to accommodate its workers. These townsites have not been profitable investments in themselves to petitioner but have been necessary to obtain the labor required for operations. At Wilson the company operates the public facilities *162 with the exception of the production of electric current, and it contributes only to the cost of operation of the public schools. All of the residents of the several townsites are employees of the company or members of employees' families. At the time of decedent's death the company had approximately 3,000 employees and the total number of residents on the company's property was approximately 11,000 persons. As the company's activities increased it entered into various other enterprises as necessary for the proper operation of the company's various holdings. It established stores in the various areas where it held land, which stores made sales to the general public as well as to employees of the company. The various improvements added by the company to its properties included, in addition to tenant farm houses and stores, cotton gins, feed mills, drug stores and machine shops. In addition to its real estate holdings the company owned stock in corporations, was a member of several partnerships and had various agency contracts. At the date of decedent's death it was engaged in some 60 or more enterprises, including banking, wholesale gas and oil, dairying, cotton trading, road building, *163 filling stations, retail lumber, insurance, farming implements and many others. The principal crops raised by Lee Wilson & Co. in 1943 were cotton, soy beans and alfalfa. The company ginned its cotton, which was the "money crop," and either sold it or held it, depending upon market conditions. It also ginned cotton for surrounding areas and bought cotton from other farmers for resale. Many of its tenants were share croppers who were financed by the company in making and harvesting their crops. Its operations required large outlays of funds but, since its operations extended from year to year to meet necessities, it has never been able to establish reserves of working capital. Necessary funds were acquired through loans from banks on the basis of mortgages or other security and when the corps were harvested the security was replaced by warehouse receipts and the loans paid from the sale of the crops. In carrying on its operations, one of the problems of the company has been labor shortage, and this was particularly acute in 1943 due to the emigration of much of the farm labor to manufacturing cities to engage in war work. This required at that time a considerable change-over in *164 its operations to a mechanized system of farming. This change involved large expenditures for mechanical farm equipment and the cost of labor to operate such equipment was considerably above that paid to the class of labor formerly employed. J. H. Crain, as trustee, is assisted by managers whom he hires and who in turn are responsible to him for the conduct of one, or sometimes two or more, of the various operations of the trust. These managers employ their own help, determine the wages to be paid their employees and pass upon routine matters. They are employed on a salary and profit-sharing basis and are required to consult directly with Crain only on matters of importance. The efficiency and ability of these managers is determined in general by the auditing department which checks the result of their operations. In the fiscal years beginning January 31, 1933 and ending January 31, 1943, the trust realized net income and paid taxes by years and in amounts as follows: Net
Net
Income
Income
Fiscal Year
Per
for Tax
Taxes
Ending in
Books
Purposes
Paid
1934
$104,816
$184,975
$ 27,359
1935
402,794
108,071
14,860
1936
256,158
241,702
33,427
1937
96,274
183,700
25,344
1938
209,765
226,174
32,143
1939
262,902
315,854
58,236
1940
304,921
387,608
74,340
1941
324,955
424,397
196,898
1942
536,587
684,987
275,807
1943
488,799
767,822
356,100
*165 The taxable net income and tax liability of the trust for the fiscal year ending January 31, 1943 have not been finally determined and the above figures for that year are from the tax returns. All other figures are as finally adjusted between the trust and the respondent. The net income after taxes, the distributions to the shareholders and the additions to surplus for the above years were in amounts as follows: Net
Distri-
Income
butions
Fiscal Year
after
to Share-
Additions to
Ending in
Taxes
holders
Surplus
1934
$157,616
$157,616
1935
93,211
93,211
1936
208,275
$100,000
108,275
1937
158,356
100,000
58,356
1938
194,031
150,000
44,031
1939
257,618
150,000
107,618
1940
313,268
100,000
213,268
1941
317,499
150,000
167,499
1942
409,180
150,000
259,180
1943
411,722 *
150,000
261,722
The assets and liabilities of the trust, as reflected on its books on January 31, 1943, are as follows: ASSETS
Book Values
Cash
$ 330,706.10
Cash for Seed
145,939.45
Notes Receivable
647,672.44
Accounts Receivable: Open
$ 297,636.45
Secured
369,636.77
Affiliates
346,842.45
Employees
128,170.28
Total
1,142,285.95
Less: Reserve for Doubtful Accounts
67,818.28
1,074,467.67
Inventories: Merchandise Store
490,071.56
Logs and Lumber
134,685.16
624,756.67
Agriculture: Cotton
322,440.21
Corn and Hay
8,193.97
Planting Seed
20,168.85
350,803.03
Livestock: Horses and Mules
59,125.92
Cattle and Hogs
36,908.50
96,034.42
Land:
2,643,816.64
Depreciable Assets
1,122,989.82
Less: Reserve for Depreciation
414,014.45
708,975.37
Equipment and Supplies
176,477.96
Timber
65,365.64
Partnerships: Delta Lumber Co.
8,340.72
Armorel Drug Co.
1,685.76
Keiser Supply Co.
225,000.00
Missco Implement Co.
20,000.00
Idaho Grocery Co.
29,664.07
284,690.55
Affiliates: Bank of Wilson
62,115.67
Helens Cotton Oil Co.
129,500.00
Wilson Motor Co.
29,610.00
Blytheville Development Co.
21,058.55
Delta Products Co.
31,779.75
Delta Valley & So. Railway Co.
14,300.00
288,363.97
Other Investments: Keiser Bond (Town)
1,000.00
Pine Bluff Production Credit Corp. (Farm Credit)
5,905.00
Merchants and Planters Bank (Stock)
6,000.00
American Overseas Trading Co. (Stock)
73.00
Times Publishing Co. (Stock)
500.00
Memphis Realty Co. (Stock)
675.00
Memphis Compress & Warehouse Co. (Stock)
1.00
Bassett Dunbrick Co.
500.00
U.S. War Bonds
74,000.00
Defense Stamps
206.85
88,860.85
Memberships: Delta Products Co.
200.00
Five Lakes Outing Club
4,555.00
Wilson Feed & Seed Co.
10.00
4,765.00
Scrip
290.64
Deferred Charges: Insurance
24,584.47
Freight
5,194.66
Payroll
51,440.60
Unearned Interest
7,809.77
Deposits
1,802.05
License
178,10
91,009.65
Total
$7,622,996.05
LIABILITIES
Accounts Payable: Merchandise
$ 95,563.17
Affiliates
76,767.74
Employees
64,739.42
Accrued Interest
5,538.98
Stockholders
128,182.35
Miscellaneous
355,725.93
$ 726,517.59
Notes Payable: Banks
6,986.42
Loans
664,580.72
671,567.14
State County and Improvement Taxes
91,832.98
Federal and State Income Taxes
381,742.73
Unearned Income
79,772.47
Investment
1,000,000.00
Surplus
4,671,563.14
Total
$7,622,996.05
*166 The land owned by the trust had, with its improvements, an average value in June 1943 of $100 an acre at Armorel and Wilson and of $70 an acre at Victoria. The record does not allocate these values as between the land and improvements. The acreage and the approximate total value of the land and improvements, in each are, respectively, as follows: Approximate Value
of Land and
Area
Acreage
Improvements
Wilson
27,373
$2,737,300
Armorel
6,822
682,200
Victoria
12,092
846,440
Total
46,287
$4,265,940
On June 15, 1943 Lee Wilson & Co. owned 1,504 2/3 out of 2,000 outstanding shares of stock of the Bank of Wilson, which stock then had a fair market value of $119 per share. In its fiscal years ending in 1939 to 1943, inclusive, the trust received income from partnerships, affiliates, and investments by years and in the respective amounts as follows: Fiscal Year
Income From
Ending In
Partnerships
Affiliates
Investments
Total
1939
$ 45,480.65
$ 4,440.00
$2,100.00
$ 52,020.65
1940
40,266.93
3,810.00
2,298.00
46,374.93
1941
36,085.33
2,778.00
2,463.00
41,326.33
1942
128,265.46
3,738.00
132,003.46
1943
123,140.11
28,435.83
1,920.00
153,495.94
*167 As of the date of death of decedent, Lee Wilson & Co., in addition to its farm lands, owned an island in the Mississippi River known as Peter's Island. On this property at that time it was carrying on logging and sawmill operations. These operations were closed in 1944, after decedent's death, and the remaining timber was sold by the company for a consideration of $200,000. In computing the deficiency here in issue, respondent determined a fair market value of $830 for each share or certificate of beneficial interest in the trust known as Lee Wilson & Co.
On June 15, 1943, the date of death of petitioner's decedent, the shares, or certificates of beneficial interest, in the trust known as Lee Wilson & Co. had a fair market value of $395 per share. In 1919, the decedent was issued a beneficial certificate by the Fraternal Aid Union in the face amount of $3,000. The beneficiary designated by her to receive payment upon her death was her husband, R. E. Lee Wilson. The certificate in question contained a form for the purpose of designating a change in beneficiary by the insured. Upon the death of her husband, in 1933, the decedent changed the beneficiary and upon the policy designated *168 her three children as beneficiaries in equal amounts. Upon decedent's death, payment of this benefit was made to the named beneficiaries and not received by the executor of her estate. In determining the deficiency here in question, respondent included this benefit certificate in the amount of $3,000 as insurance includible in decedent's gross estate for estate tax purposes. Opinion The principal issue is the fair market value on June 15, 1943 of the shares or certificates of beneficial interest in the trust known as Lee Wilson & Co. The decedent at the time of death was the owner of 2,666 2/3 of these shares. We have set out in considerable detail in our findings the circumstances surrounding the organization of the enterprise known as Lee Wilson & Co., the conditions under which the enterprise is operated by the trustee, the rights of the individual shareholders, the assets and liabilities of the trust estate, and the amount of its earnings over a period of years, together with the amount of such earnings distributed in each year to the shareholders. It appears from the record that the respondent first determined a value for the shares in question of $392.17 per share. This *169 was done through respondent's representative, one Reynolds, who it appears had charge of estate tax valuations in the Oklahoma City district. These shares had been valued in the estate tax return filed for the decedent's estate at $353.92 per share. The higher valuation arrived at by Reynolds was accepted by the petitioner and an additional estate tax of $37,294.34 was assessed and paid. Following this a new valuation was determined by respondent, the amount of which is not disclosed by the record but which resulted in an increase in estate tax in the sum of $17,386.64, which amount was assessed, and paid by petitioner. Following this a third determination of fair value of the shares of Lee Wilson & Co., in the sum of $830 a share, was made by respondent, which amount together with certain small adjustments resulted in the deficiency here in question of $496,311.76. Upon the hearing of this proceeding, respondent does not attempt to support the determination of value of $830 per share, but contends for a value of $753.05 per share. It is contended by petitioner's counsel that no presumption of correctness attaches to the determination of fair market value by respondent in view of *170 the fact that he has abandoned the value determined and asserted in the deficiency notice and now comes forward with a different valuation in a lesser amount. Respondent's counsel disputes this contention. It would appear to us, however, that the question is purely academic and has no bearing on the determination of the issue. The rule is clear that the presumption of correctness attaching to a determination by the Commissioner does not constitute proof of value. It is only a rebuttable presumption and has effect only in the absence of testimony that such determination is erroneous. Here such evidence has been introduced by the petitioner, and whether or not the presumption existed prior to the introduction of this proof, it has been overturned by this evidence. There is much evidence in the record respecting the value of properties owned and operated by the trust estate and the earnings from such operations over the years, together with the amounts of such earnings distributed to the shareholders by the trustee. These facts necessarily have to be carefully considered and given weight in arriving at a determination of fair market value for the shares of beneficial interest. The only *171 specific evidence as to the fair market value of the shares is contained in the testimony of two witnesses, one for the petitioner and one for respondent, who qualified and were permitted to testify as expert witnesses upon the question of valuation. The petitioner presented the testimony of an economist of wide experience through many years in the analysis and valuation of securities. Much of his time in past years has been spent in work for various bureaus of the Government is well as for private industries in the analysis of security values. A study of the question of fair market value of the shares of beneficial interest here involved was shown to have been painstaking, thorough and intelligent. His study of the question required one year. He had first visited the properties of Lee Wilson & Co. and had studied the operations, together with the financial record of the company as to earnings and dividends. One of the normal ways to value a security, as to which there have been no market sales, to determine its market value is by comparing it with a security of a similar organization whose securities are traded on the market. In the present case such comparison could not be made *172 since the operation of Lee Wilson & Co. is apparently unique. It is basically a farming operation but includes in large measure manufacturing, merchandising and to some extent public utilities. Recognizing this condition, this witness made his analysis from several approaches. As the basic activity of Lee Wilson & Co. was farming, the witness took the stocks of the seven leading agricultural implement manufacturers whose stocks were listed on the New York Stock Exchange. These he selected by reason of the fact that it could be reasonably assumed that the market for their products, and subsequently the earnings and the prices at which the stock would be bought by the public, would be affected by conditions making agricultural operations profitable or otherwise. The record of these companies showed that the average annual net income per share of the common stock for the five years 1938 to 1942 was 7.24 per cent of the market value of the shares on June 15, 1943, and the annual dividends paid per share for the five years by these companies averaged 3.27 per cent of the market value of the shares on June 15, 1943. He also took the composite priceearnings ratios for 50 selected stocks *173 compiled by Barron's Magazine, a recognized financial journal. These 50 companies were drawn from all lines of business. This analysis showed that on June 11, 1943 those 50 stocks were selling at prices which represented 12.6 times the prior five years' average earnings on the stock and 11.4 times the previous year's earnings. Stated at capitalization rates, these prices represented average earnings of 7.94 per cent, capitalized on five years' earnings. This witness also took the analysis of Standard & Poor's Corporation on 50 leading stocks in various companies. For the year 1943 these 50 stocks were selling at between 11.3 and 14.9 times the earnings of the corporations. The dividends were being capitalized under Standard & Poor's compilation at between 4.32 per cent and 5.43 per cent. The mean of the price-earnings ratio was 13.4 times and this applied to the earnings of Lee Wilson & Co. for the fiscal year ended January 31, 1943 would indicate a value per share of $458.82. The average dividend capitalization rate was 4.88 per cent, and this would indicate a value per share, on the basis of dividends on shares of Lee Wilson & Co. for that fiscal year, of $307.37. The witness *174 further called attention to the report of Standard & Poor's Corporation as of July 14, 1943 on 90 stocks - 50 industrials, 20 railway and 20 public utility. These stocks were selling at that date at approximately 14.88 times the earnings for the preceding 12-month period. The dividends on the same stocks were capitalized at 4.32. These ratios applied to the earnings of Lee Wilson & Co. for the year ending January 31, 1943 would indicate a value of $509.49, based on earnings, and $347.22, based on dividends. This witness made a further analysis and comparison on the basis of land rental in Mississippi County, Arkansas, in which the farm lands of Lee Wilson & Co. are located. The figures used in this analysis were those compiled by the Federal Government. The witness also took into consideration the fact that all of the stocks used in the comparison were actively traded and could be sold by the owner if desired, whereas the shares of Lee Wilson & Co., because of the conditions of the trust instrument, were not marketable and were not even acceptable to a bank as collateral security for a loan. It was also noted that the owners of any of the stocks compared had rights as stockholders *175 to participate in management that were denied to shareholders of Lee Wilson & Co.
On the basis of his investigation and analysis, this witness testified that in his opinion a fair market value of the shares of Lee Wilson & Co. was $395 per share. The expert witness introduced by the respondent was a member of a firm engaged in the security and investment business at Little Rock, Arkansas. He had had considerable experience in analyzing stock and bond issues in determining the price at which they could be sold to the public. His firm was experienced in the underwriting of various security issues. His experience, from his testimony, appears to have been confined to marketable securities, either those listed on the stock exchange or those having a recognized market in over-the-counter transactions. Testifying as an expert witness upon a hypothetical question propounded by respondent's counsel, this witness testified to what he termed a fair market value for the shares of Lee Wilson & Co. of $753.05 per share. Upon being interrogated as to the basis of his determination of this figure, the witness stated that there was no comparative industry to use in arriving at fair market value *176 because of the peculiar characteristics of the securities represented by shares in Lee Wilson & Co., and that he recognized the fact that the shares had no marketability and consequently he could think of no other method to value them than by taking the net worth of the company as computed by him under the direction of the hypothetical question asked and dividing it by 10,000, the number of outstanding shares, which gave a figure of $753.05 per share. In preparing his statement of net worth of Lee Wilson & Co., this witness had taken the book value of the assets, with a slight adjustment with respect to the value of certain bank stock to which petitioner has agreed, and increased this amount by $200,000, as representing the value, at the time of decedent's death, of timber on Peter's Island. This timber was carried on petitioner's books as of that date at a figure of $65,365.64. He had also, under the direction given him in the hypothetical question, increased the account carried on petitioner's balance sheet as "land" from a figure of $2,643,816.64 to $4,266,025.60, an increase of $1,622,208.96. This adjustment resulted in an increase of the net book value of petitioner's assets *177 in an amount something in excess of $1,750,000. Putting aside for the moment the question of the correctness of respondent's method of valuing the shares of the trust, we do not think the factors directed to be used by the witness in the computation of net worth, in so far as timber and land values are concerned, are justified by the record. As of the date of decedent's death in 1943, the timber on Peter's Island was carried on the books of Lee Wilson & Co. at a figure of $65,365.64. As of that date, this country was engaged in a war, the date of termination of which could not be foreseen. Its domestic economy was tremendously disrupted and the operations of industry were restricted. Respondent bases his figure of $200,000 wholly on the fact that in 1945, after the close of the war, the timber in question was sold by Lee Wilson & Co. for $200,000. His counsel states that it is assumed that if the timber sold for that figure in 1945 it must have had a fair market value in that amount in 1943. We do not think this assumption justified. As to the increase by $1,622,208.96 of the amount at which the company carried its land on its books, the record shows that such increase is computed *178 upon the basis of the testimony of several witnesses introduced by the respondent who made a general valuation of the company's land and improvements thereon. These witnesses made no attempt to survey, inspect and value the individual parcels making up the land holdings of the company. These holdings lay in three large separate tracts known as Armorel, Wilson and Victoria, a total of 46,287.94 acres. These witnesses testified to an average value of the land and improvements in these areas of $100 per acre for Armorel and Wilson and $70 per acre for Victoria. This adjustment of the book value of land as appearing on petitioner's books overlooks the fact that there was carried on the books a very large account representing depreciable property, into which class would fall the improvements on the land. These depreciable assets were carried at a total book value of $1,122,989.82, against which a reserve for depreciation was set up in the sum of $414,014.45, leaving a net asset balance of $708,975.37. The witnesses in question made no attempt in their testimony to segregate the value of the improvements from the value of the land, nor do they attempt to estimate the fair market value of *179 the shares of the trust. How much of the total value testified to by these witnesses represents improvements is not shown by the record, but we think it manifest that the use of the total value of land and improvements in the hypothetical question asked the witness which increased the value of the land while making no adjustment in the book value of the depreciable assets carried separately on petitioner's books was unjustified and raises a very grave doubt as to the correctness of the figure directed to be used by the witness in determining his valuation of the shares of Lee Wilson & Co.
On the basis of the adjusted net worth of the company as computed by the witness under the hypothetical question propounded to him, he assumed that net worth so computed represented the value of the various assets as of June 15, 1943, the date of decedent's death, and that his determination was made on the basis of what he termed "replacement value" at the expiration of 15 years, when the trust, he stated, would terminate. He assumed, for purposes of his estimate of fair market value, that the various assets of the trust would be worth at the end of 15 years the same amount they were worth on the *180 critical date, and his valuation was based upon his assumption that the purchaser of shares at $753.05 per share would have a right, on the expiration of 15 years, to participate in these assets on that basis and would thus realize his investment. Aside from the question of doubt attaching to the correctness of this witness's assumption of fair market value of the assets of the company, we are not impressed with his testimony as to fair market value of the shares. It was nothing more than a naked valuation of the assets of the trust estate, where the actual valuation to be arrived at was the fair market value of the shares of beneficial interest. As the Supreme Court said in Ray Consol. Copper Co. v. United States, 268 U.S. 373: "The capital stock of a corporation, its net assets, and its shares of stock are entirely different things. * * * The value of one bears no fixed or necessary relation to the value of the other. * * *" It is noted that the witness's assumption that the trust will terminate at the expiration of 15 years and that the purchaser now of shares will then participate in the distribution of assets is not justified. It overlooks the fact that under *181 the terms of the trust instrument the holders of two-thirds of the shares may elect to continue the trust for an additional term of years. Such action has been once taken under this provision of the trust upon a former expiration of the term. Here we are concerned with a valuation of a block of shares representing less than a one-third interest, and it could not reasonably be assumed that the Wilson family, the holders of the remaining shares, would agree to liquidation. The picture presented by the record, of the organization of the trust estate, its property holdings and its method of operation with more than 60 different types of farming, manufacturing and servicing businesses integrated into a working whole, built up through the years, indicates clearly that the liquidation of these various assets would destroy in large measure the value of many of them. Certain of the assets consisted of towns not profitably operated as such but necessary to the operation of the entire property. In these towns petitioner owns and operates all of the properties and certain of the public facilities. The stores which it owns and operates, with very large inventories as shown by the balance sheet, *182 although serying the general public, have also as their customers employees of the company and their families, approximately 10,000 persons. It is apparent that these stores operate without competition, as no business can come in upon the lands of the company without its permission. Manifestly, assets of this kind would in large measure lose their value if liquidated and sold or distributed individually among the holders of beneficial shares of the trust estate. We can see no basis for the assumption on the part of a purchaser on June 15, 1943 of shares of Lee Wilson & Co. that dividend distributions of $15 per share made in several years prior to 1943 would be increased. These were the distributions made in the prosperous years. We can not visualize a purchaser as tempted to invest his funds in Lee Wilson & Co. at $753.05 per share, where he could reasonably anticipate a return of slightly less than two per cent on his investment for a period of 15 years with a possibility, which we can not see as justified, that he might recoup his investment at the end of that period. This is especially so in view of the fact that he would hold an investment which had no marketability and upon *183 which he could not even secure a bank loan in time of necessity. In fact the record includes the figures secured by the United States Department of Agriculture on the average yield of rental income upon land owned and rented in Mississippi County, Arkansas, and upon the basis of these figures a purchaser of 2,666 shares of Lee Wilson & Co. at the value of over two million dollars, testified by this witness to be the fair market value, could with this amount of money buy farm land in that county which would produce a rental income far in excess of that enjoyed in any year by holders of shares of Lee Wilson & Co. It may also be noted that a purchaser of land under these conditions would own the property outright, with the ability to sell or mortgage it as the necessity might arise, a condition not permitted to the holder of the participating shares here in question. It is easy to understand the statement by this witness near the close of his testimony, where he frankly admits that although his estimate of fair market value for the shares was $753.05 per share, he would not advise a client of his to pay that amount for shares in Lee Wilson & Co. We think that the testimony of this witness *184 carries little weight as against the very reasonable, explicit testimony of petitioner's expert witness. The valuation by petitioner's witness is based upon the factors which would be considered by a prospective purchaser in determining what he could afford to pay, or would be justified in paying, for the shares in question. We think that these factors are the correct ones to use in determining the fair market value of the shares in question as of June 15, 1943. We have carefully considered the testimony of these two witnesses, together with testimony as to the business, the values of the properties operated by the trust and the income produced and distributed. We have also given careful consideration to the peculiar character of the shares in question and the limited rights of the shareholders, and feel that our determination of $395 per share as the fair market value of the shares of beneficial interest is amply supported by the record. The remaining issue is upon respondent's inclusion in decedent's gross estate of the amount of a benefit certificate in the Fraternal Aid Union in the amount of $3,000, in which she designated her husband as beneficiary. The certificate, or policy, *185 which is in evidence, contained a form for a change of beneficiary by the insured. Upon the death of decedent's husband in 1933, she exercised her right to change the beneficiary and designated her two daughters and her son to receive the proceeds in equal parts. It is petitioner's contention that this insurance is not includible in decedent's estate by reason of section 811 (g) (3) of the Internal Revenue Code. [1] This provision applies only to insurance which is transferred by assignment or otherwise. Here there is no evidence that the insurance was ever assigned or transferred to others. There appears to have been merely a change of beneficiary. There is nothing to indicate that decedent did not possess on the date of her death the right to designate another beneficiary or to take the full loan value accumulated on the certificate. *186 Under these conditions the quoted section has no application. Section 811 (g) (2) (B), Internal Revenue Code, provides for the inclusion in the gross estate of amounts receivable by other beneficiaries as insurance under policies upon the life of the decedent "with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person." Under this provision it appears clear that respondent's action in including the proceeds of this insurance in decedent's estate was correct and his action is approved. Decision will be entered under Rule 50. Footnotes
*. Not yet finally determined.↩
1. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * *
(g) Proceeds of Life Insurance. - * * *
(3) Transfer not a gift. - The amount receivable under a policy of insurance transferred, by assignment or otherwise, by the decedent shall not be includible under paragraph (2)(A) if the transfer did not constitute a gift, in whole or in part, under Chapter 4, or, in case the transfer was made at a time when Chapter 4 was not in effect, would not have constituted a gift, in whole or in part, under such chapter had it been in effect at such time.↩